[No. B220526. Second Dist., Div. Three. Sept. 10, 2010.]

In re SCOTT B., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
DOLLY B., Defendant and Appellant.

454

## COUNSEL

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Dolly B., the mother of the minor child Scott. B. (Mother and Scott, respectively), appeals from a section 366.26 order that terminated her parental rights. At issue in the appeal is the applicability of a statutory exception to termination of parental rights—the parent-child relationship exception.

---

[1] Unless otherwise indicated, all references herein to statutes are to the Welfare and Institutions Code.

(§ 366.26, subd. (c)(1)(B)(i).)[2] Mother contends the exception applies to her relationship with Scott and therefore the dependency court committed reversible error when it chose adoption as a permanent plan for Scott and terminated her parental rights. She contends the trial court should have identified legal guardianship as the appropriate permanent plan for the minor child.

Our review of the record convinces us that Mother's position is well taken. We will therefore reverse the order that identified adoption as Scott's permanent plan and terminated Mother's parental rights.

## BACKGROUND OF THE CASE

### 1. Initiation of the Case and Mother's First Appeal to This Court

#### a. Efforts to Avoid Detention of Scott by the Dependency Court

This case commenced in July 2006 with a section 300 petition alleging physical abuse of Scott by his maternal grandmother (MGM) and Mother's failure to protect the child; violence between Mother and Scott's maternal uncle; Mother's neglect of the minor's hygiene; and filthy, unsanitary conditions in the family home where Scott lived with Mother, the MGM, and Scott's two uncles. Scott, who was born in October 1998, was seven years old at the time. Prior to the petition being filed, attempts had been made to resolve the family's problems through the Los Angeles County Department of Children and Family Services (the Department). Scott had been diagnosed through the Los Angeles Unified School District as having characteristics consistent with ADHD (attention deficit hyperactivity disorder) and a need for special education services, and diagnosed through Regional Center as having a "qualifying diagnosis of Autism that is substantially disabling." At the detention hearing on the initial section 300 petition Scott was not detained by the dependency court. Instead the court ordered the Department to provide family maintenance and preservation services, wraparound services, and Regional Center services for Mother and Scott. The court ordered that Scott not be left alone with the MGM.

Prior to the court's adjudication of the initial petition, the Department filed a first amended section 300 petition. As with the initial petition, Scott was not detained by the court at the detention hearing on the amended petition. At the

---

[2] The parent-child relationship exception in section 366.26, subdivision (c)(1)(B)(i) provides that a dependency court should not terminate parental rights when the court finds there is a "compelling reason for determining that termination would be detrimental to the child . . . [because]: [¶] (i) [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

adjudication and disposition hearing on the amended petition the court sustained allegations that Mother has a limited ability to care for the minor which results in a detrimental home environment including dirty and unsanitary conditions; there is aggressive behavior by the MGM and uncle towards Scott and other family members in the family home; and Scott's parents failed to reunify with his siblings who were dependents of the court. The court declared Scott a dependent of the court and made a home of parent (Mother) order with family maintenance services.

### b. Detention of Scott Is Ordered

A variety of services were provided to Mother in connection with this case but she had trouble utilizing them and she was not able to discipline Scott and control his behavior. The principal at Scott's school did not believe Mother was capable of caring for the child. Scott had behavior problems at school and problems interacting with his peers; Scott's special education teacher reported the minor's behavior was regressing; and Scott, who had bladder control issues, often came to school dirty and smelling of urine. Scott's court-appointed special advocate (CASA) stated in her January 2007 report that Scott and Mother have a very close relationship but Mother was overwhelmed with the child's special needs and was not able to provide him with the type of care and supervision he requires. The MGM continued to be an extremely negative influence in Mother's and Scott's lives, but Mother was unable to find alternative housing because of her health problems and developmental needs. The CASA recommended that the dependency court terminate the home of parent order and place the minor in foster care.

The Department filed a section 342 "subsequent petition" on March 21, 2007, after Scott had been found riding a bus for hours by himself and several days later was found wandering the streets alone, wearing no shoes, wearing dirty clothes, and smelling of urine. The subsequent petition alleged Mother failed to provide the minor with adequate supervision. This time the court detained Scott in shelter care. Reunification services and concurrent planning for permanent placement were ordered, and Mother was given monitored visitation.

As of March 26, 2007, Scott was in his third foster home and remained placed there. He began attending therapy on a regular basis and demonstrating a willingness to participate in the sessions. Mother was visiting him weekly and he interacted positively with her and enjoyed the visits. Scott told his CASA he liked living with his foster family and would like to live with Mother again. The foster mother reported Scott had adjusted well to her home and his new school, he was learning table manners and learning to eat well-balanced meals, and he enjoyed family events and interacted well with

the children and adults in the home. His visits with Mother were good and he was heard to tell her he wanted to live with her again but not in the same apartment with the MGM. He indicated he wanted Mother to move out of the MGM's home and have her own place. Members of the wraparound team that had been assembled for him reported that since moving to the foster home the minor was more verbal and communicative, there was a vast improvement in his behavior, and his social skills were improving. The foster parents were giving him toilet training and his bladder control was improving. He appeared to be thriving in their home. Scott told the Department social worker he liked his foster home and his new school. The social worker observed that during Scott's visits with Mother in the park she had little control over him and let him do whatever he wanted. The foster parents reported Scott generally followed their directions.

At the July 9, 2007 adjudication and disposition hearing on the section 342 subsequent petition the court sustained the allegation of Mother's failure to adequately supervise Scott, found that Scott would be at risk in Mother's care, and ordered custody taken from her and Scott placed in foster care. The court found that Mother had failed to reunify with Scott's many siblings and her parental rights had been terminated as to some of them. The court further found that Mother had not made reasonable efforts to treat the problems that led to the removal of Scott's siblings, and it was not in Scott's best interest for Mother to be provided with services for reunification with him. However, Mother's monitored visits were continued. Mother filed an appeal challenging the jurisdiction finding, removal of Scott from her care, and the court's denial of reunification services. We heard the appeal and affirmed the disposition order by our unpublished opinion filed on April 1, 2008.

### 2. Dependency Activities Subsequent to Mother's First Appeal

#### a. September 2007 Matters

A September 2007 report from the CASA states the CASA interviewed Scott, the foster mother and various social workers for the report. The CASA noted that living with the foster family had brought immense changes in the minor. When the CASA would visit with the minor prior to his removal from Mother's home he was very withdrawn, practically nonverbal, did not express his feelings with words but instead would growl and thrash about, lacked social skills and struggled with social interaction, did not attend school on a regular basis, and lacked adequate toilet training. Since living with the foster family he had become "quite verbal and expressive," appeared to be comfortable with the adults in his life, was seeing to his own hygiene and personal care, was interacting well with the other children in the home, and was attached to his foster sister.

The foster mother reported Scott did very well in summer school. He was having difficulty adjusting to the new school year but it was getting better. He no longer was wearing Pull-Ups during the day, only at night. His weekly visits with Mother continued. They were visiting at a park. The foster mother stated the minor's behavior regressed during the visits and he reverted to his old ways of growling and whining and it took a while for his behavior to adjust when he returned home to the foster family.

The foster family agency social worker was meeting with Scott on the days he had his visits with Mother and she witnessed his regressive behavior. She stated he was very bonded with his foster family. Another social worker spoke with Scott's parents and explained to them that if a family member was willing to adopt the child then the parents could continue to have a relationship with him. Mother did not want to discuss that, but Scott's father (Father), who sometimes came to Scott's visits with Mother, was open to it and stated he would contact the social worker.

The CASA stated Scott referred to the foster family as his family and he liked living with them. However Scott wanted to know when he could resume living with Mother. Scott stated the MGM was still living in the apartment and Mother was doing okay. The CASA opined in her report that although the minor continued to ask when he could return to Mother's care, it was clear that Mother does not have the capacity to provide an adequate home for him, and adequately care for him and protect him, despite the numerous services that had been provided to her. The CASA recommended that the court order adoption as the permanent plan for the child.

A combined review hearing under section 366.21, subdivisions (e) and (f) was held on September 25, 2007. At that hearing the court set a section 366.26 hearing for January 23, 2008.

### b. *The Initial Section 366.26 Hearing*

In her January 2008 report the CASA stated Scott told her he was doing great, he liked his teacher, but he did not like homework. He was attending a combined third-fourth grade special education class. He told the CASA about the foster family's birthday celebration for him, the presents he received for Christmas, and the decorations on the foster family home. The foster mother reported the minor continued to thrive in her home and his teacher was pleased with his progress. He continued to visit with Mother on a weekly basis and his behavior often regressed after the visits, with growling and whining. The foster mother stated Mother was sharing too much inappropriate information with Scott about her life and it seemed to burden the minor. Scott did not mention Mother during the week and did not show an interest in calling her.

The CASA reported that Scott only mentioned Mother to her to share past experiences, and he continued to refer to his foster family as his family. He went to an adoption fair in November 2007 with a Department adoption worker. The foster mother stated her family would be his foster family for as long as necessary but the family was not considering adopting him at that time. She was concerned about the foster home's close proximity to Mother's home because Scott was a different child when he was around Mother.

The Department's report for the January 23, 2008 section 366.26 hearing states Scott continued to have wraparound services including weekly individual therapy, and it was reported that he was beginning to be better able to discuss his feelings, thoughts and emotions and was working toward developing tools to enable him to discuss core emotional issues. He was considered by the Department to be adoptable. The adoption social worker reported Scott is personable and outgoing, and he "has some special needs which will need to be considered in an adoptive match." He was reported to have been diagnosed as a high-functioning autistic child. He was assigned to a special needs adoption recruiter "due to his needs and family background." The report states "[t]here are many opportunities for recruitment for Scott. DCFS is confident these efforts will result in an adoptive match for Scott." No relatives had been identified for possible placement. Mother continued to visit with Scott on a regular basis at the park, where he would greet her with a hug and play on the play equipment. He was exhibiting tantrums and growling frequently during the visits but such behavior "rarely occurs otherwise." Mother did not attempt to correct the behavior. Father would sometimes come to the visits. The report states Scott was closer to Mother than to Father.

At the January 23, 2008 section 366.26 hearing the parents' attorneys requested increased visitation with the minor. Mother was having a two-hour visit once a week. The court stated that given how Scott regressed during the visits it would not be appropriate to increase visitation time. The CASA stated that she had just witnessed such regressive behavior at the hearing and "it was shocking." The court observed that when Scott comes to court the behavior he exhibits is "very familiar [as] some of the behaviors described in the report in terms of not being verbal, being very closed." However, the court also observed that when Scott came into the courtroom "he went directly to sit next to his mom. He is sitting close to his mom." The court instructed the Department to "clarify the role of the monitors" that attend Mother's visits and whether the role is to monitor the conversation between Mother and Scott and stop the visits if there is an inappropriate conversation.

c. *The July 22, 2008 Section 366.26 Hearing*

The section 366.26 hearing was continued to July 22, 2008. The CASA's report states Scott informed her he was happy living with the foster family.

He stated Mother was fine and he saw her every week at the park. He reported she was still living with his "mean grandmother" and that made Mother sad. He stated that although he did not want to go to court, he did want to tell the judge that he wanted to live with his mom and he would "take care of" his grandmother. He stated he missed Mother.

The foster mother reported the minor continued to do very well in her home, was a delight to have as part of her family, and he would be entering special education fourth grade in the fall. He was taking care of his own hygiene and had no problems with the rules of the house. He continued to meet with his parents weekly at the park. The foster mother and the foster agency social worker were monitoring the visits. The foster mother was of the opinion that Scott liked the visits primarily because he got to play at the park. She stated the child's regressive behavior when he was with Mother continued but was less so than before. Scott did not ask for his parents during the week and when the foster mother asked him if he would like to call Mother he always told her "not now."

In April 2008 Scott began telling his friends and teacher that he was going to go live with Mother on May 1, 2008. He confessed that he made up the story and the foster mother explained to him that he must not tell lies or make up stories. He continued to have weekly therapy and biweekly behavioral therapy wraparound services. The foster agency social worker reported she had not noticed any inappropriate conversations between the minor and his parents. She reported that although Scott was doing better with regressive behavior overall, during the last two visits he exhibited more regressive behavior with Mother. The social worker asked Mother if she had anything to do with Scott's story about moving back with her. Mother denied that she did.

The Department adoption worker had identified a potential adoptive family but the family backed out of the adoption process due to personal reasons. The foster mother stated she was not interested in adopting Scott but would foster him indefinitely. The CASA's report states it was clear to the CASA that Scott and Mother have a very close relationship and despite the minor's temporary regression when he visited Mother the visits are an important part of his life. Nevertheless the CASA opined that adoption would be the best permanent plan for him.

The Department's report for the July 22, 2008 hearing states Scott continued to look forward to his weekly visits with his parents. He had an updated photo and biography online for adoption Web sites and an agency that recruits foster and adoptive families. There were three families that inquired about Scott but each passed on him when they found out about his family

history (possible mental health issues with Mother and Father) and his level of functioning. However, another adoptive match was made for Scott in June 2008 and a preplacement conference was held. The social workers felt it was a good match and the applicant indicated interest in a presentation. Visits would be scheduled if the applicant wanted to proceed after the presentation.

### d. *January 13, 2009 Hearing*

The July 22, 2008 section 366.26 hearing was continued to January 13, 2009, for identification of a prospective adoptive home and transitioning towards adoption. Scott turned 10 years old in October 2008 and was in fourth grade special education. He told the CASA he was happy and liked the foster family home. As usual, he reported on the outings that he and the foster family had taken. He reported not liking school but said his new teacher was okay. His weekly visits with Mother continued and he stated she was doing fine, and although his grandmother was no longer living in the apartment because she could not use the stairs, his two uncles were still there.

The foster mother reported to the CASA and the Department social worker that she wanted to adopt Scott because she and her family had grown very much attached to him and he had become an important part of the family. She stated Scott and her daughters, especially her nine-year-old daughter, are very close, and Scott completes their family. A home study was begun. The foster parents had broken up and the foster mother, her two daughters, Scott, and the foster mother's grandmother moved into a house across the street from where they had been living with the foster father. The foster father remained in the old house and was seeing the children daily but he planned on moving to Mexico in the summer. The foster mother reported the children had adjusted well to the new arrangement and the new house.

Scott continued to have weekly visits with Mother in the park and while he occasionally showed regressive behavior when he was with her, she was better able to set boundaries for him and she did not give in to him the way she used to do. Scott's father had moved out of the state. Scott's weekly therapy continued, as did his biweekly behavioral therapy, which was addressing some repetitive behaviors.

The CASA recommended that Mother's parental rights be terminated and the Department proceed with adoption. The foster mother stated that after she adopts Scott he would be able to.see Mother "on occasion" and maintain a relationship with her. The CASA stated she was pleased that the foster mother intended to allow the minor to maintain contact with Mother, and the CASA opined "this is very important." The Department social worker reported the foster mother was willing to enter into a kinship adoption agreement with

Mother, and the foster mother and Mother "have a positive working relationship and she values her connection with Scott. [Foster mother] recognizes that continued contact between Scott and his biological mother is important." The foster mother acknowledged that Scott loves Mother and looks forward to seeing her. The Department indicated it was too early to terminate parental rights because the home study had just begun in mid-December 2008.

At the January 13, 2009 hearing Mother's attorney indicated that the people who were living with Mother had moved out and therefore Mother might file a section 388 petition to have the minor returned to her care. The section 366.26 hearing was continued to April 21, 2009, and again to May 14, 2009, to allow the Department time for the adoption home study.

   e. *The May 14, 2009 Hearing*

Based on developments occurring after the January 2009 court date, the CASA withdrew her recommendation that Mother's parental rights be terminated, and instead recommended that adoption be placed on hold. In her report for the May 2009 section 366.26 hearing the CASA stated the adoption process had hit a roadblock because of Scott's reaction to the prospect of adoption and his reaction to Mother's recent surgery and serious medical condition.

The foster mother told the CASA she still wanted to adopt the minor and to continue with the adoption home study, but Scott had made it clear that he did not want to be adopted and if the adoption were to occur he would run away. He was insisting that he wanted to live with Mother and nowhere else, and at one point he did make an attempt to leave. While he and the foster mother were out shopping she caught him heading for an exit and when asked where he was going he stated he was going to get a bus. She was keeping a more watchful eye on him.

Scott's behavior had regressed to growling and biting, including biting his foster sister, and he had begun lying. He lied about biting the foster sister, saying a boy told him to do it. He made sexual remarks to a girl at his school and denied to persons at school that he had made the remark, although he did admit to the foster mother later that it was true. He had a discussion with the foster mother about the seriousness of the matter and a session with his therapist, and he apologized to everyone. Mother's medical condition was taking its toll on the minor. He was not able to sleep because he was worried about her, and thus was waking up tired in the morning.

The foster agency social worker continued to monitor the weekly visits between Mother and Scott. The worker reported she tried to stay close to

them and she did not hear Mother say anything about the adoption. However, there were times when she was not in close proximity to them. Mother denied having said anything to Scott about adoption. The social worker was certain Scott could continue to have a relationship with Mother if he were to be adopted by the foster mother. The Department adoption social worker stated the home study was on hold. The worker stated Scott told her that Mother told him he does not have to be adopted. Scott stated he hated the judge and it was the judge's fault that he does not live with Mother. The worker was not sure if Scott understood the severity of Mother's medical condition, but Scott was upset that Mother had lost her hair and was wearing a scarf. The worker stated the foster mother was hesitant about adoption but did want to proceed with the home study.

Mother stated the CASA was promoting the adoption, and she and Scott did not want it. Mother stated she had done the things required of her (parenting classes, counseling, etc.), and she did not understand why the minor has not been returned to her care. The CASA observed that Mother and Scott have an "extremely close bond" and the stress of the adoption and Mother's medical condition could be overwhelming him, and therefore the adoption should be temporarily placed on hold. The CASA recommended that the section 366.26 hearing be taken off calendar while Scott received appropriate therapeutic services to help him with Mother's illness and transition to adoption. The adoption home study was approved on May 13, 2009.

The Department reported that Scott graduated from his wraparound program and the foster mother was given counseling referrals so that he could resume therapy. Because of his autism Scott requires an environment that provides him with structure and support. He is considered mildly autistic. The foster mother was worried about Scott's threat to run away because he is "very savvy as to the bus system" and thus is capable of running away if he wants to. She was also concerned about the effect adoption would have on him. Scott had been living with her for about two years. The social worker's report states Scott has thrived because of the foster mother's efforts with him and with his treatment and school, including her ability and willingness to use public services to meet his needs. Scott told the social worker that he wants to continue living with the foster mother and visiting with Mother.

The foster agency social worker who monitors Scott's visits with Mother reported that Mother was being more appropriate with the minor during the visits in that she tended to not reward him if he had a difficult week at school or at the foster home whereas before she would always reward him regardless of his inappropriate behavior. Mother was also better about reprimanding him when he was not following directions and correcting his actions. Scott's

behavior was also more mature during the visits. They remained interactive at the visits even though Mother is physically challenged and not able to participate in most of Scott's physical activities. The foster mother told the Department social worker that Scott loves Mother and looks forward to their visits. The foster mother stated she understands the minor needs Mother in his life and the foster mother would make every effort for Scott to stay in contact with Mother if the court terminated Mother's parental rights.

It was not clear to the Department social worker why Scott no longer wanted to be adopted but it was clear that Scott was adamant about the issue. Based on Scott's feelings and his threats to run away if he is adopted by anyone, the Department did not recommend that parental rights be terminated, and it requested more time to investigate whether adoption would be the best permanent plan for the minor. That request was honored and the May 14, 2009 section 366.26 hearing was continued to October 22, 2009. The court ordered that Scott be enrolled in therapy with a licensed therapist forthwith and referred for wraparound services. The court stated its belief that "the problem is Mother's visits need to ensure that they are within ear shot." When Scott's attorney suggested that the visits be at a Department office because Scott does not stay in one place at the park the court ordered the Department to consider moving the visits to another location.

### f. Final Reports and Hearings

The CASA's and Department's final reports were for the October 22, 2009 section 366.26 hearing. The CASA's report states Scott was in a fifth grade special education class. He told the CASA he was doing well and was happy and he related the nice time he had on his birthday outings. He stated he was visiting with Mother every week and she was doing well. He stated he still wants to live with Mother but if he cannot he wants to live with his foster mother.

The foster mother reported things had settled down at her home since Scott began working with a therapist and behaviorist. Scott was no longer acting out and was well behaved except for some recent incidents of his lying to her and occasional anger issues, and he did acknowledge the lies when she asked him directly about them. She stated she had resumed having conversations with Scott about adoption because she was ready to move forward with it, and he was handling it much better than before. She stated Scott seemed to understand that he would not be living with Mother again and he wanted to continue living with the foster family. She said she told him that if she adopts him he will be able to continue to see Mother regularly. She reported Scott continued to look forward to his weekly visits with Mother.

Scott's therapist reported she was able to have uninterrupted time with Scott because she picked him up and drove him to his visits with Mother and he was open and candid with her. Although his anger was easily triggered he had better management of it. He appeared to have guilty feelings about being removed from Mother's care when he ran away. He continued to have regressive behavior on his visits with Mother. The therapist was spending time at the visits and reported that Mother appeared to be taking better care of herself, and Mother was working with a parent partner at the therapist's agency and was holding out hope of Scott being returned to her care. The parent partner told the CASA her goal was to listen to Mother's concerns, "help her with this situation," and help her work with "all of the parties involved." She stated she explained to Mother that it was a great opportunity for Scott to be adopted by the foster mother.

The CASA opined that it is imperative that when Scott is adopted he maintain contact with Mother as it is clear that Mother and Scott are extremely close and it would be detrimental for their relationship to be disrupted. The CASA stated it is in the minor's best interest to receive a permanent home with the foster mother "while maintaining the close bond he shares with [Mother]."

The Department social worker was of the belief that during Mother's visits with Scott she was telling him he would be coming home to her and that caused him to refuse to be adopted, but since visits between Mother and Scott were moved to the foster family agency office and were being more closely monitored "there has been significant improvement." The social worker's report states Scott believed that adoption was preventing him from returning home to Mother.

A team decision meeting was held on July 29, 2009, to reinstate wraparound services for Scott. At the meeting Mother stated she wanted the minor returned to her care, but she did agree that he should remain with the foster mother if he were not returned to her. In early September 2009 the foster mother reported that Scott had stabilized with the wraparound services and the support of Mother. She stated he was no longer making threats to run away and she and Scott were ready to move forward with adoption. Later that month the foster mother reported that when Scott was talking about adoption he stated he wanted to be adopted because he did not want to go to another house. He wanted to remain with the foster mother and continue visiting with Mother.

The October 22 hearing was continued to November 16 to allow for more hearing time and for Scott to be present. Based on Scott's statements that he wanted to be adopted because he did not want to go to another house, and on

the foster mother's assurances that Scott can continue to have contact with Mother if he is adopted, the Department recommended that the parents' parental rights be terminated and adoption proceed. However, in a "last minute information for the court," the Department informed the court that during the Department social worker's interview with Scott in early November 2009, the minor was asked for his feelings about the foster mother's desire to adopt him and Scott stated that he had changed his mind about adoption and if the foster mother did adopt him he would run away because he wanted to live with Mother. Scott stated Mother could care for him because his uncles were no longer living with Mother. When the social worker told him he could continue to see Mother if he were adopted, Scott continued to state he did not want to be adopted. He stated he could think of no reason to change his mind about that. He added that "the judge" had stated that Mother was doing what she was supposed to do and had stated that he, Mother and the foster mother could go places together. He acknowledged that he did feel good living with the foster mother, that he loved her, and that he knew the foster mother loved him.

The social worker noted that Scott has always maintained that he wants to live with Mother, and that he told the adoption social worker he only wants to stay with the foster mother if he cannot live with Mother. The social worker opined that Scott believes it is adoption that will prevent him from living with Mother and he does not understand that he will not be returning to Mother's care if the foster mother does not adopt him. The Department continued to recommend that he be adopted.

At the November 16 hearing Scott and Mother gave testimony, with Scott testifying in chambers. Scott testified he visits with Mother every week and it is good. They play with toys, watch movies and television, and eat if she brings food. He enjoys his visits with Mother, he looks forward to seeing her and he is happy to see her. He stated he wants to continue living with the foster mother and wants to continue having visits with Mother. Asked who he would want to live with if he had his choice, he stated he misses Mother but if he cannot go back to her home then he would live with the foster mother. When the court indicated that the questions for Scott were finished, Scott spontaneously stated that he wanted to be adopted so that he, Mother and the foster family could all "go somewhere fun." Asked what it means if someone is adopted, Scott answered: "I forget." Asked what would happen if he were adopted, he answered that he would "stay with her forever." Asked if that would be good or bad, he stated: "Good. I don't want to go to that other house with that German shepherd."[3]

---

[3] When the attorneys were presenting their arguments to the trial court on the issue whether parental rights should be terminated, Father's attorney noted that when Scott told the court he did not want to go to the "other house with that German shepherd," he clenched his fist and

When the hearing resumed in the courtroom Scott was excused from the hearing. Mother testified she had been visiting Scott every week for two hours for two years and she has only missed one visit. When they visit he runs to her and jumps and gives her a bear hug. She calls the minor "Scottie" during the visits because he likes to be called that now. During their visits they watch movies and she brings him treats if he behaves. She and Scott discuss his behavior and she explains to him that whether he will receive treats the next week will depend on how he has behaved. She also assists the foster agency social worker and some of the staff members with the issue of Scott's behavior. When the visits end she and Scott have "more than one hug" and they tell each other they will have another visit the following week. Scott calls her "Mom."

In addressing the issue of a permanent plan for Scott, Father's attorney observed that Mother had only missed one visit with Scott, and Mother and Scott have a strong bond. The attorney argued that Mother is not just a playmate at her visits with the minor, she addresses his behavior in her role as a parent. Noting that Scott loves where he is living and loves both Mother and the foster mother, the attorney argued that the only way to maintain both the mother-son bond and Scott's bond with the foster mother, so that there would be no question that both bonds would be preserved, would be for the court to order a legal guardianship for Scott. The attorney argued that this is "one of those rare cases" where a parent has overcome the Legislature's preference for adoption and demonstrated a statutory exception to termination of parental rights in that the relationship between Scott and Mother must be protected and a legal guardianship is the means of doing that. Mother's attorney joined in Father's argument and added that although Scott may understand he cannot go back to living with Mother, nevertheless when he spontaneously told the court that he wanted to be adopted, he explained that the reason he wanted to be adopted was so that he and Mother and the foster mother could do things together, and thus his concept of adoption is that it includes Mother. The attorney noted that although there might be an informal agreement for Mother to have continued visitation, that arrangement could change.

"his mouth sort of keyed up." Scott's reference to the "other house" is apparently to the home of one of the foster mother's friends. In December 2008 the foster mother stopped at her friend's apartment for a visit. She had her two daughters and Scott with her. When the foster mother asked to use the friend's bathroom it was discovered that the friend's puppy had soiled the bathroom floor. The foster mother and one of her daughters went next door to use a neighbor's bathroom and the other daughter went to help clean up the puppy's mess. Scott was watching television in the living room. When the foster mother and daughter returned Scott was missing. He apparently has a strong aversion to unpleasant odors and so he had left the apartment and walked to the street because he was overwhelmed by the odor from the dog relieving itself, and because he could not find the foster mother and her daughters. A concerned citizen found him and took him to the police. The foster mother called the police to report him missing and reunited with him at the police station.

The court observed that Scott's concept of adoption appeared to be that "the other people" would not be involved anymore (such as monitors) and it would be him and the foster mother and Mother and they could do things together. Mother's attorney argued that a legal guardianship would take care of the issues and Scott could maintain his visits with Mother. Regarding the Legislature's stated preference for adoption, the attorney argued that the section 366.26, subdivision (c)(1)(B)(i) parent-child relationship exception to termination of parental rights applies in this case because Mother and Scott have maintained regular visitation and he would benefit from continuing their visits. The attorney asserted that Scott's statement that he would run away if he were adopted demonstrates that continuing the parent-child relationship would be a significant benefit to him. Scott's attorney argued that Mother is not able to assume a parental role because of her limited ability to provide for his needs as a special needs child, and adoption outweighs the benefits of a legal guardianship since a guardianship would only provide for permanence until Scott is 18.

The court found that Mother does have a parental role with Scott in that during their visits they do not simply play and enjoy each other's company but rather, Mother also takes a hand in instructing him on behavior issues. Nevertheless, the court found that Mother's parental role and relationship with Scott do not outweigh the benefit and permanence of adoption. The court stated the minor needs consistency and stability in his life and the consistency and stability that adoption will provide "outweigh the benefit of continuing the relationship." Finding that Scott is adoptable, the court terminated the parents' parental rights. The court stated the foster mother "has discretion to permit ongoing visits with the mother."

Mother filed a timely appeal from the order terminating her parental rights.

## CONTENTIONS ON APPEAL

Mother contends that Scott never understood that adoption requires termination of her parental rights. She contends the minor believed that he could be adopted and he would still have Mother as a part of his life, and he did not understand that the foster mother will be able to prevent him from having contact with Mother. Mother asserts that adoption will have a very negative effect on Scott and therefore the trial court should have chosen legal guardianship as the permanent plan for the minor so that he will not be wrenched from Mother, with whom he has always stated he wants to live.

## DISCUSSION

### 1. *Adoption Is the Legislature's Preferred Permanent Plan*

■ Because adoption is more secure and permanent than a legal guardianship or long-term foster care, adoption is the Legislature's first choice for a permanent plan for a dependent minor child who has not been returned to the custody of his or her parents and who is found by the dependency court to be adoptable. (§ 366.26, subd. (b); *In re Celine R.* (2003) 31 Cal.4th 45, 53 [1 Cal.Rptr.3d 432, 71 P.3d 787].) To avoid termination of parental rights and adoption, a parent must demonstrate that one or more of the section 366.26, subdivision (c)(1)(A) or (B) exceptions to termination of parental rights applies to his or her child. The parent has the burden of proof on the issue. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 [103 Cal.Rptr.3d 538].) Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption. (*In re Celine R., supra*, 31 Cal.4th at p. 53.)

### 2. *Standard of Review*

Reviewing courts have applied various standards of review when considering trial court determinations of the applicability of these statutory exceptions to termination of parental rights. In *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [93 Cal.Rptr.2d 644], the court observed that both the substantial evidence test and the abuse of discretion test have been applied, and the court stated that "[t]he practical differences between the two standards of review are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' . . ." ' [Citations.] However, the abuse of discretion standard is not only traditional for custody determinations, but it also seems a better fit in cases like this one, especially since the statute now requires the juvenile court to find a 'compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)[(B)].) That is a quintessentially discretionary determination. The juvenile court's opportunity to observe the witnesses and generally get 'the feel of the case' warrants a high degree of appellate court deference. [Citation.]" (*Ibid.*)

Citing *In re I.W., supra*, 180 Cal.App.4th at pages 1527–1528, the Department disagrees that the substantial evidence test can be applicable in the instant

case. In *In re I.W.*, the reviewing court stated that the substantial evidence test is "typically" implicated in situations where a defendant challenges the sufficiency of evidence to support a judgment in favor of the plaintiff, but the test is not applicable when the party with the burden of proof on an issue at trial appeals, and that would include a parent having the burden of proof on the applicability of a statutory exception to termination of parental rights. The *I.W.* court stated that in the latter case, the reviewing court must determine "whether the evidence compels a finding in favor of the appellant as a matter of law" such that "the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*Id.* at p. 1528.)

In the instant case, application of any of the three standards of review convinces us that Mother's parental rights should not have been terminated because the parent-child relationship exception to termination of parental rights applies in this case.

### 3. *Nature of the Parent-child Relationship Exception to Termination of Parental Rights*

■ The "parent-child relationship" exception in section 366.26, subdivision (c)(1)(B) provides that a dependency court should not terminate parental rights if "[t]he court finds a *compelling* reason for determining that termination would be *detrimental* to the child . . . [because]: [¶] (i) [t]he parents have maintained regular visitation and contact with the child and the child would *benefit* from continuing the relationship." (Italics added.)

In *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535], the court described parent-child relationships that can prevent termination of parental rights as relationships that "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only

where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." Application of this exception is decided on case-by-case basis and a court takes into account such factors as the minor's age, the portion of the minor's life spent in the parent's custody, whether interaction between parent and child is positive or negative, and the child's particular needs. (*Id.* at pp. 575–576.)

### 4. *Application of These Principles to This Case Militates Against Termination of Parental Rights*

■ Scott had just turned 11 years old when Mother's parental rights were terminated. He was nearly nine years old when he was placed with his foster family and thus he had spent nearly all of his life living with Mother. After he was removed from her care he had consistent weekly visits with her and he looked forward to the visits. The CASA repeatedly stated in her reports that Mother and Scott have a very close relationship and it would be detrimental to Scott for their relationship to be disrupted. The mother-child relationship in the instant case, coupled with Scott's continued emotional instability and his repeated insistence that his preference would be to live with Mother, presents a compelling reason for finding that termination of parental rights is detrimental to the minor.

Although it is clear that permitting Scott to resume living with Mother may never be in his best interest, it is also clear that even though Scott truly does love his foster family, he wants to be with Mother if at all possible. Scott has remained strongly bonded with Mother even though the life she provided for him when he was living with her was insufficient, even though his development was arrested during the time they lived together, and even though he has been in the care of the foster mother since March 2007. Scott's spontaneous statements to the court at the section 366.26 hearing demonstrate that his ability to handle being adopted by the foster mother is fragilely based on his belief that being adopted means he and Mother and the foster family will all "go somewhere fun," and he will not be placed in the home with the dog. He emotionally accepted adoption because he believes that adoption means Mother will be included to some extent in the foster family's activities.

It is clear that Scott did not understand that his foster mother would have the right to cut off his contacts with Mother if she adopted him. It is also clear from the record that Scott's emotional makeup will not enable him to endure interruption of his long-standing frequent visits with Mother. Yet, in the 10 months between when the foster mother decided she wanted to adopt Scott and the day when Mother's parental rights were terminated, the foster mother gave different indications of how often she would permit Scott to visit with

Mother if she adopted him. She stated she told Scott he could visit with Mother "regularly"; but at another time she told the CASA Scott could visit with Mother "on occasion." Although the CASA opined, and the record clearly shows, that it would be detrimental to Scott for his relationship with Mother to be disrupted, after the dependency court terminated Mother's parental rights, the court stated that whether the foster mother would permit further visits between Scott and Mother *was within the foster mother's discretion.*

■ In early September 2009 the foster mother reported to the Department social worker that Scott had stabilized with the resumption of wraparound services *and the support of Mother.* Mother provides stability to Scott's life. That is what adoption is supposed to do, but it may not in this case. Given Scott's strong emotional attachment to Mother, his continued precarious emotional state, and his history of regressing and running away when he is stressed, there is a very good chance that he will have a meltdown if his usual frequent visitation with Mother does not continue. The only way to avoid that serious emotional and developmental setback and ensure that Scott's usual visitation with Mother continues is by court order. The only way to have such an order is to have Scott's permanent plan be legal guardianship or long-term foster care. Between the two plans, legal guardianship is the Legislature's stated preference as it provides much more stability for a minor child, and based on the appellate record in this case it is legal guardianship that should be the permanent plan for Scott. The record demonstrates that adoption, with its inherent possibility that Scott's usual contacts with Mother would be interrupted, poses the chance of a danger not worth taking. For that reason we agree with the Department's statement that "what is at stake is the fundamental question of whether Scott will continue to thrive, as he has done since being placed with [his foster mother]." Termination of parental rights is unnecessary given that a legal guardianship will provide Scott with stability in his life.[4]

It is the hope of this court that Scott's foster mother will understand the need for a legal guardianship in lieu of adoption, and will agree to continue her very admirable care of Scott. It is clear that the behavioral, emotional, social, personal care, and educational progress Scott has made since being detained by the dependency court and placed with the foster mother is, in very large measure, the result of the foster mother's guidance, patience,

---

[4] At the time of the section 366.26 hearing in November 2009 Scott was one year younger than the statutory minimum age (12) for consideration of whether a minor's objection to termination of parental rights can be found to be a compelling reason for determining that termination would be detrimental to the minor. (§ 366.26, subd. (c)(1)(B)(ii).) However, because of Scott's emotional and developmental status, his feelings about adoption are necessarily considered when determining whether the parent-child relationship exception to termination of parental rights applies in this case. (§ 366.26, subd. (h)(1).)

affection, discipline, and willingness to participate with her time and efforts in the many services provided to the minor by and through the Department. She believes in Scott, and he clearly needs both of his mothers—his biological mother and his foster mother.

## DISPOSITION

The order from which Mother has appealed is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

Klein, P. J., and Kitching, J., concurred.